Good morning, your honors, officers of the court. May it please the court. The instant case raises two issues. The first issue is that of the narrowing gap between the credibility standards of the REAL ID Act and the doctrine of de minimis non curis lex. The REAL ID Act requires the I.J. to employ the rule of reason as a starting place. However, the reality is that all too often that is ignored or forgotten. The totality of circumstances requirement, so common in other areas of our laws, is not always an active element in immigration decisions such as the instant case. Congress unquestionably has the power to increase the standards by which a respondent must comply to be found credible. The employment of this requirement within the statute is often quietly ignored. This court recently raised the standard even higher for pre-REAL ID immigration cases with N. Ying Lee v. Holder, that's 08-70586, when it held that under a totality of circumstances, one material discrepancy or untruth is sufficient to find a respondent's entire testimony false. This is the maximum falsus in uno, falsus in omnibus rule. In the instant case, the trial court listed five individual examples of unresponsiveness. The first example was when the judge, the court asked, how did you get the materials and the respondent merely said, from Korea. That was followed by, immediately, by the next question, where did they come from? And he said that they were mailed to me, explaining how they fell into his hands. The immigration judge's charge of unresponsiveness clearly fails when we just go to the next question. This is not a matter of evasion. This is not subterfuge. This is merely a matter of an unsophisticated foreign citizen trying to do his best to answer the judge's question and being rather long-winded about it. The second issue. Let me ask you, Mr. Mayor, was there a translator involved here? Yes, there was. And, sir, I believe that was part of the problem as well. The second issue was the number of times that the respondent was taken from prison back to the Public Security Bureau. Now, what became clear through the questioning was that there was an interrogation room in the prison and in the Public Security Bureau. The judge did not get to this until after a few questions. It was not clear that the respondent was interrogated in prison at all, but later on it turned out he was interrogated there five times. Again, this was more subject of the mode of questioning than anything else, and certainly not a material issue as to where he was interrogated. An interrogation, especially a brutal one, speaks for itself. The third issue was the cost of his travel. He was asked how much did it cost by the court. The respondent replied that it was arranged by his uncle. Then, more directly, he was asked what did it cost, and he said that his wife had told him that it was about $20,000 a U.S. Again, he was overeager to tell the entire story. He wasn't as direct as he might have been. But we're dealing with an unsophisticated foreign citizen. This was an issue where he testified and the I.J. didn't believe him. Perhaps he overcounted the lack of responsiveness, perhaps. But is there any – was there any corroboration of any of this, of any of his testimony? Did he have any papers of any kind? There was a very limited amount of documentary evidence, and that actually is the second issue. Actually – Do you want to finish going through the non-responsiveness? If I may. Certainly. Thank you, Your Honor. So, again, he explained that it cost – he had heard, not personally because he didn't have firsthand knowledge, but his wife had told him that the cost was around $20,000. So it was answered explicitly. It just took two questions instead of one. The respondent was asked if he had applied for his passport. He replied, an agent did it for me. Also the Malaysian visa, which he used to escape to Malaysia. Again, this was arranged by an agent. He did not handle it, and he was very specific. I didn't do it. I gave a photograph, I gave the signed documents, and the agent took care of it. That was determined as well to be unresponsive. The last one, the fifth one, is given the fine receipt, he wanted to know how there was – he was asked, was there a fine receipt issued? The respondent said that, no, there wasn't, that he had heard about it from his wife. Well, the judge asked how he heard about it. Again, it took two questions, but he replied, I heard it from my wife. She said she was not given one. This is in the record. I guess that's why this leads me to the question about the corroboration. Several times as you recited this, the information seems to be in the wife's knowledge. Yes. Right? So since the information seems to be in the wife's knowledge, the I.J. wanted to know if there was a statement from the wife. Right. Okay. And there was some testimony about that might be hard to get, but we might be able to get it. So where does that lead us? I mean, since the testimony is about things the wife did, it seems it's not crazy for the I.J. to want to know something from the wife. No, it's certainly not crazy, and it certainly would help to clarify, and I understand the government's desire to acquire as much evidence as possible. But under the Real ID Act, this was simply unavailable. Now, if we go to Shrestha. Was it really unavailable? It was, because, first of all, he was from a very small village in a remote area. His wife did have a phone, but the police. Small village isn't exactly right. He testified it was about 100,000 people. He said 100, and then he said 1,000. There were two separate phrases. My understanding is it was a small village of 100, maybe 1,000 at most. So why does that make it unavailable? Because, what, everybody will know what the wife's doing? Well, his wife was being watched, yes, and his wife was being visited by the police irregularly, but nonetheless being visited by the police. He was so afraid of possibly implicating his wife in his escape from China that he wouldn't even call her directly. He had a circle of friends. Was he given advance notice by the I.J. that he was going to require corroborating evidence and what it would be? No, he did not. So the I.J. did not give him advance notice. The I.J. said evidence is necessary, and I advised him that if it is reasonably available. He was afraid to call his own wife and husband for several years. I'm just confused. We have the hearing, and it's not before the hearing, but during the hearing that the I.J. says, you know, this would be useful to have something from your wife, correct? I do not recall the I.J. saying that. Okay. So you're telling us that the I.J. advised him that it would be useful for him to bring anything, but didn't identify anything in particular that the I.J. would be expecting to see. That's correct, and it was not mentioned until the merits hearing, the final hearing. Okay. Counsel, you're down to 7 seconds. Did you want to say something for rebuttal? Just that if the government were to argue that it was an abuse of his position as a postman to deliver these materials, I would say that they were paid for, and so he did not abuse his position. Okay. Thank you. Thank you. May it please the Court, Matthew George for the Attorney General. I apologize to the Court. I'm having an issue with my eye, so if I'm blinking or something like that, I apologize in advance. The issue before the Court is whether the totality of the circumstances compel the finding that Mr. Ginn was not credible, or excuse me, was credible. As counsel, opposing counsel has already pointed out, the I.J. identified five specific instances where Mr. Ginn gave nonresponsive answers. The I.J. explicitly identified the factors supporting his adverse credibility. What is the scope of our review in determining whether the answers were indeed nonresponsive? Well, the overall standard of review is substantial evidence, and so we have to look given constitutes substantial evidence of being unresponsive. Yes, Your Honor. All right. Now, do you concede that the I.J. has a duty, when given an unresponsive answer, to advise the Petitioner that the answer is unresponsive and to allow him an opportunity to reframe his answer to be more responsive, as would be the case if it were a contradictory answer under soto alarte? I'm not sure exactly what extent the I.J. has a duty. In this case, the I.J. certainly It's a case called Guo, G-U-O, right? And it says that where the Petitioner is unresponsive, the I.J. Especially in situations where the Petitioner is testifying through a translator. As we know, translators, we have a recent example in healthcare.gov, a translation which was not too precise. Translators do sort of impede the communication between the parties. Don't you think that the I.J. has an obligation? If he thinks the answer is unresponsive to advise the Petitioner, you're being unresponsive. I didn't ask that question. This is the question I've asked. I'm not sure. I'm not familiar with the cases Your Honor has cited, so I can't really speak to the absolute obligation that the immigration judge has. In this particular case, I think the testimony or the transcript shows that the I.J. did take those actions. In some cases he did, right? And on occasions when he did, weren't the consequent answers responsive? In some instances, more. Right. For instance, how did you get this material? It came from Korea. Then, no, I asked you how you got it. Well, it came in the mail. So that clears that up, right? It's not unresponsive any longer. There's no substantial evidence that it's unresponsive. So that one we can get rid of. Are there any that you think that were unresponsive, were followed up by the I.J., and remained unresponsive? And if so, please tell me. Addressing that specific question, I point to the issue over obtaining the official passport or whatever the precise matter was with that, and obtaining the Malaysian visa. In that instance, the issue was broader than just what he said. We're not talking about unresponsiveness now. We're talking about lack of credibility as to how he did something, which was to obtain the passport, right? Yes, Your Honor. Jin testified that his uncle paid other persons to obtain a passport for Jin and helped Jin flee China and travel the United States, correct? Yes, Your Honor. Why is that incredible? Well, he also, in writing an explanation for why he did not go to Beijing or why he traveled on his own passport, that he just generally speculated that, well, maybe my information isn't in the system yet, given that he had testified that the public security office was required. He was speculating, but wasn't he asked to speculate? How would Jin know what was going on with the Chinese passport system? Well, that's the overall issue. The immigration judge was trying to find out. Right. But he asked him to speculate. Jin speculated, which was completely responsive to his question. And then he dings him for speculating. That's kind of unfair, isn't it? It's Mr. Jin's burden to make out a credible question. Right. But he doesn't – but the question here, we started off with the question as to whether he was responsive. And that's what the IJ said was, he was not responsive to the questions and, therefore, I don't find him credible. It turns out he was responsive in this instance, in this example that you've cited, that he was responsive to the question. But now you're telling us that the problem is that he was speculating. Well, but he was asked to speculate. So that's not being unresponsive. And he did what he was asked to do. He said, well, maybe it's because it didn't make its way through the system. That doesn't strike me as – as incredible. At the same time, I think because this is reviewed under the totality of the circumstances, we can't necessarily focus on any one particular matter. I think that I wouldn't mind that. Okay. But in response to Judge Baer's question, you told us that he was responsive on the question of how do you get the materials. That was counsel's first point. The question of how you applied for the passport, we've now agreed that he was also responsive, but it was invited to speculate. That was his fourth point. Now, do 2, 3, and 5 tell us anything? Do you have anything better on points 2, 3, and 5? What's your strongest – what's the government's strongest point, that he was not responsive? In looking at it in that manner, it's sort of obliterating the totality of the circumstances. I'm happy for you to take – to defend all of them, if you wish, counsel. But I would like you to – I would like you to defend them. I would say it's possible for the Court to say that he was ultimately responsive, more or less. Okay. Would you use – again, back to Judge Baer's first point about how did you get the materials. I got them from Korea. I didn't ask where you got them from. I asked how you got them. I got them through the mail. Okay. That's responsive. Are you going to use that as part of the totality of the circumstances to show that he's incredible? Yes, Your Honor. There's five examples here. Really? And the Court cannot divide and conquer and simply look at each one individually and say, okay, he explained that one. Never mind. That one's gone completely. But he answered – he answered the question. He answered the question. I got them in the mail. But – If all of them were responsive, there's no totality of unresponsiveness. His five zeros add to zero, don't they? That's not – that's not the totality of the circumstances analysis, though. We can't simply look at them individually. The Court has to look at the pattern. The quality of the translation here is extraordinarily crude. No one's raised the issue of translation here. Well, but it's obvious, isn't it? It's obvious that this was a crude translation. I can't – I'm not a translator, Your Honor. I can't look at a record and determine what the translation is. Well, I mean, it's – it comes back to the I.J. in pidgin English. Now, either the translator is a very, very good translator and Jin only speaks pidgin Chinese, or the translator has limited capacity in English and is rendering in English the best he can from the Chinese that Jin is speaking to him. Then Mr. Jin's counsel should have raised that as an issue. It's pretty obvious, though, just looking at the – I mean, if I were an inquisitive I.J., I would want to know whether my translator spoke flawless English in response to my questions to the translator. Well, no one has raised that issue. Unfortunately, counsel, we see – you know, we see thousands of immigration cases, and we – from time to time we see some really horrendous problems with translations. Well, there's no evidence on this record regarding the translation. I don't think the Court can just sui sponte say this was a bad translation. Can I ask a question about the corroboration? Because I actually thought that he was responsive, and I didn't think it was fair for the I.J. to say he wasn't. So I was wondering whether there were documents that should have been presented that weren't and that the I.J. asked to see. And that wasn't clear to me from this record either, that there were documents that were missing that should have been there and they were requested. So is that this kind of case, or do we not have that here? We do have the issue of documents that were requested that were not presented, that there's been – When were they requested, and what was the language in which they were requested? As far as I can tell, Your Honor, they were requested at the actual merits hearing. They were not requested in advance. However, at the end of the merits hearing, the immigration judge specifically asked, is there something else or anything else that you would like to provide Mr. Ginn's counsel? Did the I.J. suggest that the merits hearing be continued for a reasonable period of time to allow the Petitioner to procure the documents that were requested for the first time at the hearing? The immigration judge did not do that. However, he asked Mr. Ginn's counsel if he had anything else. Mr. Ginn's counsel, on the record, considered whether he would take the opportunity to find specifically the household register, and then decided not to do that and said, there's nothing else I'd like to present. And so he had an opportunity to request it. What would the household register add to this? The household register would have corroborated the fact that he was a mailman. That was specifically what the immigration judge pointed to with respect to that. There was also the statement from the wife, as the Court has pointed out, and also the medical treatment evidence. And I see I'm out of time. Okay. So those were three things that could have been presented, and but the I.J. didn't say, please present those things in this amount of time. The I.J. never made an explicit, I'm going to give you a continuance or extra time to get that. However, he did ask at the end of the hearing. If you have anything in general you want to present. But the opposing counsel clearly considered whether the household registry specifically he should request additional time to get, and then declined to ask for that or make an issue of that. I'm just wondering where we are. If the answers are responsive and the I.J. doesn't ask for anything in particular, then I'm not sure what his basis is for ruling against Mr. Ginn. What's the substantial? Well, there's no the statute doesn't require advance warning. I know this Court has some precedent on that issue. Our position would be it is not a binding precedent anymore. It's dicta. The case of Wren v. Holder says that the I.J. must request corroborating evidence to provide the applicant with an opportunity to produce the evidence. Yes, Your Honor. And isn't this a post Real ID Act problem? Because the Real ID Act is the one that really puts a muscle into the corroborating evidence. This is a pre-Real ID Act case. This is a post Real ID Act case. It's post Real ID Act? Yes, Your Honor. I thought it was pre-Real ID Act. I thought Mr. Mayer said it was pre-Real ID Act. He was citing some pre-Real ID Act, a recent pre-Real ID Act decision from this Court. But this case is a post Real ID Act. Oh, Ginn v. China in 2005, so it has to be post Real ID Act. Yes, Your Honor.  I misunderstood. I'm sorry. Yes, Your Honor. So that statute would apply. I do recognize the existence of Wren and its standard, but it would be our position that. Wren is the post Real ID Act case, right? Yes, Your Honor. For the circuit. It would be our position that that is dicta and it is not required by the statute, as recognized in the panel decision in Ashodi. Okay. Well, if you don't have to – okay. If you think it's dicta and you don't have to tell him that we need this evidence before the hearing, shouldn't he – and it comes up during the hearing that the I.J. wants this stuff. Doesn't the I.J. have to say, I want this stuff and I'll give you time to put it in? None of this stuff seems totally crucial to me. I mean, this is – the fact that he was a mailman doesn't seem to be a big dispute. And I'm not sure what the medical records are going to show corroborating evidence from his wife. I mean, you know, I don't know. It didn't seem crucial to me, this evidence. And so, therefore, it seemed to me it was in the I.J.'s discretion to say, you know, I want this in this case because I don't know what's happening or this is – I don't see any other documents. That's exactly it, Your Honor. The statute allows for corroborating evidence even in otherwise credible testimony. It's entirely within the immigration judge's discretion. Yeah, so he could say, I want this, I want this, and I wouldn't want this. Yes. All right. And that's what he's done here. But he didn't say that. He didn't say, I want this, I want this, and I want this. Well, he gave three specific examples of corroborating evidence that he would have liked to see. And then no one asked for anything. Even after recognizing that, you know, let me think about whether I should try to get that. And then saying, no, I'm not going to try to get that. I thought the request was more general. Do you have anything? Well, it was in general, but that issue was clearly before the parties in there. All right. Thank you, counsel. We've taken you well over your time. We thank you for your answers. Mr. Mayor, I'm going to forward you another minute. You've used all your time, but I'm going to give you another minute for anything you'd like to say. You do not have to use the minute if you don't wish it. Okay. Thank you very much. We thank counsel for the argument. The case of Ginn v. Holder is submitted.
judges: Restani, Bybee, Bea